**Richard McGARY, Plaintiff–Appellant,**

v.

**CITY OF PORTLAND, Defendant–Appellee.**

No. 02–35668.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 12, 2004.

Filed Oct. 27, 2004.

Karen A. Berkowitz, Legal Aid Services of Oregon, Portland, OR, Edward Johnson, Oregon Law Center, Portland, OR, for the plaintiff-appellant.

Tracy Pool Reeve, Office of the City Attorney, Portland, OR, for the defendant-appellee.

Before: D.W. NELSON, KLEINFELD, and FISHER, Circuit Judges.

D.W. NELSON, Senior Circuit Judge.

Richard McGary brought this action against the City of Portland, alleging that the City discriminated against him on the basis of his disability, in violation of the Fair Housing Act, the Americans with Disabilities Act, and parallel state and local laws, when it denied his request for additional time to clean his yard in order to comply with the City's nuisance abatement ordinance. The district court dismissed McGary's complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). On appeal, we hold that McGary adequately pled that the City discriminated against him by failing to reasonably accommodate his disability under the relevant statutes. We therefore reverse the judgment of the district court and remand for further proceedings.

## BACKGROUND[1]

McGary, an individual with AIDS, owned and lived in a home in Portland, Oregon. McGary's illness impaired his ability to perform major life functions, including the upkeep of his property. On January 26, 2000, an inspector from the City's Office of Planning and Development Review (OPDR) inspected McGary's home and determined that the amount of trash and debris in his yard constituted a nuisance in violation of Title 29 of the Portland City Code. *See* Portland City Code 29.20.010 ("It is the responsibility of the owner of any property . . . to maintain the outdoor areas of the property [including] . . . [r]emoving, and keep[ing] removed . . .

[a]ccumulations of litter, glass, scrap materials (such as wood, metal, paper, and plastics), junk, combustible materials, stagnant water, or trash. . . ."). On February 1, 2000, OPDR sent a Notice to Remove Nuisance to McGary, directing him to remove all trash and debris from his yard by February 16, 2000.

On January 27, 2000, after the inspection but prior to the issuance of the Notice to Remove Nuisance, a patient advocate from the Cascade AIDS Project (CAP) left a message with OPDR, asking what CAP could do to help McGary meet OPDR's requirements. OPDR did not return the call. On February 5 and 6, 2000, CAP volunteers assisted McGary in removing some of the trash and debris from his yard and placed it in a dumpster rented by CAP for that purpose. However, OPDR determined that the clean-up was insufficient and issued a Notice of Work Order on February 22, 2000, and a Final Notice on March 2, 2000. McGary continued to work on cleaning his yard during this time. On March 9, 2000, a CAP patient advocate spoke with an OPDR inspector, who informed the advocate that the only way to stop a warrant from issuing was for McGary to fully clean the yard.

On March 13, 2000, McGary was hospitalized with meningitis, an exacerbation of his disabling condition. On March 14, the CAP patient advocate called OPDR and informed the inspector that McGary had been hospitalized and asked that the warrant be withdrawn. Nonetheless, OPDR issued a warrant on March 21, 2000. McGary remained in the hospital until March 24, 2000.

On March 28, 2000, the City's contractor entered McGary's yard and removed the

---

1. The facts included in this opinion are drawn from McGary's complaint. Since the district court dismissed the complaint for failure to state a claim, we must accept as true all of the

facts alleged in the complaint and construe those facts in the light most favorable to the plaintiff. *See Smith v. Pac. Props. & Dev. Corp.*, 358 F.3d 1097, 1099 (9th Cir.2004).

debris. The City then charged McGary $1,818.83 for the cost of debris removal and assessment, and placed a lien on his home for that amount. McGary subsequently sold his home and satisfied his debt and lien with the City.

On March 1, 2002, McGary filed a complaint in district court, alleging that the City discriminated against him on the basis of his disability when it denied his request for additional time to clean his yard and, in doing so, violated the Fair Housing Amendments Act of 1988 (FHAA), 42 U.S.C. § 3601 *et seq.*, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and parallel state and local laws, Or.Rev.Stat. § 659A.145 and Portland City Code 3.1000.005. McGary sought compensatory damages in an amount to be proven at trial, as well as attorney's fees and costs. The City moved to dismiss the action for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). The district court granted the City's motion and dismissed the action on June 19, 2002. McGary timely appealed.

## STANDARD OF REVIEW

We review de novo a dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Thompson v. Davis,* 295 F.3d 890, 895 (9th Cir.2002) (per curiam), *cert. denied,* 538 U.S. 921, 123 S.Ct. 1570, 155 L.Ed.2d 311 (2003). All allegations of material fact in the complaint are taken as true and construed in the light most favorable to the plaintiff. *Id.* Dismissal of the complaint is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in

support of the claim which would entitle him to relief. *Id.*

The Supreme Court has cautioned that, in reviewing the sufficiency of the complaint, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Jackson v. Carey,* 353 F.3d 750, 755 (9th Cir.2003) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

## DISCUSSION

### 1. FHAA Claim

 McGary alleges that the City violated the FHAA by denying his request for a "reasonable accommodation," which would have allowed him additional time to clean up his yard. Under the FHAA, unlawful discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B).[2] We have repeatedly interpreted this language as imposing an "affirmative duty" on landlords and public agencies to reasonably accommodate the needs of disabled individuals. *See, e.g., Giebeler v. M&B Assocs.,* 343 F.3d 1143, 1146–47 (9th Cir.2003); *United States v. Cal. Mobile Home Park Mgmt. Co.,* 29 F.3d 1413, 1416 (9th Cir.1994) (*"Mobile Home I"*); *City of Edmonds v. Wash. State Bldg.Code Council,* 18 F.3d 802, 806 (9th Cir.1994), *aff'd sub nom., City of Edmonds v. Oxford House, Inc.,*

---

**2.** We use the terms "disability" and "disabled," except when referring to the FHAA's statutory language, which uses "handicap" and "handicapped." *Giebeler v. M & B As-* *socs.,* 343 F.3d 1143, 1146 n. 2 (9th Cir.2003). We assign these terms identical meaning. *See id.*

514 U.S. 725, 115 S.Ct. 1776, 131 L.Ed.2d 801 (1995).

In order to state a discrimination claim under the FHAA for failure to reasonably accommodate, McGary must allege that (1) "he suffers from a handicap as defined by the FHAA;" (2) the City "knew or reasonably should have known of" McGary's handicap; (3) "accommodation of the handicap 'may be necessary' to afford [McGary] an equal opportunity to use and enjoy [his] dwelling;" and (4) the City "refused to make such accommodation." *Giebeler*, 343 F.3d at 1147.

The dispute in this case focuses entirely on the third requirement. The City does not dispute that McGary's complaint sufficiently alleged that he was handicapped under the FHAA, that it was informed of McGary's handicap, and that it refused to grant McGary the accommodation he requested. Rather, the City argues that McGary failed to allege that any accommodation was necessary to afford him an equal opportunity to "use and enjoy" his home. We hold that, while McGary's claim may not present a paradigmatic discrimination claim arising under the FHAA, it satisfies the liberal pleading requirements established by Supreme Court and Ninth Circuit precedent.

The threshold for pleading discrimination claims under the FHAA is low. In *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002), the Supreme Court held that the standard for pleading an employment discrimination claim is no higher than the relaxed notice pleading standard of Federal Rule of Civil Procedure 8(a), *viz.*, "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 512, 122 S.Ct. 992. In *Swierkiewicz*, the Supreme Court clarified that a plaintiff need not establish a prima facie case of discrimination in the complaint, since the prima facie case is "an evidentiary standard, not a pleading requirement," and often requires discovery to fully adduce. 534 U.S. at 510–11, 122 S.Ct. 992. The Ninth Circuit has explicitly extended the Court's holding in *Swierkiewicz* to Fair Housing Act (FHA) claims. *See Edwards v. Marin Park, Inc.*, 356 F.3d 1058, 1061–62 (9th Cir.2004); *see also Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248–49 (9th Cir.1997) (applying Federal Rule of Civil Procedure 8(a)'s liberal pleading standard to FHA claims and noting that this standard "contains 'a powerful presumption against rejecting pleadings for failure to state a claim'" (quoting *Auster Oil & Gas, Inc. v. Stream*, 764 F.2d 381, 386 (5th Cir.1985))).

Relying on cases from outside this Circuit, the City argues that McGary has not stated a claim under the FHAA since the City "has neither excluded [McGary] from the neighborhood or residence of his choice, nor has it created less opportunity for [McGary], as a handicapped person, to live in his neighborhood." *Howard v. City of Beavercreek*, 276 F.3d 802, 807 (6th Cir.2002). The district court adopted the City's reasoning, holding that McGary failed to allege he was denied the equal opportunity to "use and enjoy" his dwelling, since he was not denied use of his home or prohibited from living there.

Both the City and the district court misconstrue the pleading requirements of the FHAA and disregard our own precedent. The district court assumed that the impairment of the "use and enjoyment" of a dwelling under 42 U.S.C. § 3604(f)(3)(B) is limited to a complete denial of the use of a home. This constricted reading of the FHAA flouts a long line of cases "recognizing the FHA's 'broad and inclusive' compass" and instructing courts to accord "a 'generous construction' to the Act's complaint-filing provision." *City of Edmonds v. Oxford House, Inc.*, 514 U.S. 725, 731,

115 S.Ct. 1776, 131 L.Ed.2d 801 (1995) (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972)); *see also Gilligan*, 108 F.3d at 249; *Mobile Home I*, 29 F.3d at 1416. Specifically, the district court's decision cannot be reconciled with *Mobile Home I* and *Giebeler*, in which we recognized that the imposition of a financial burden on a disabled individual can interfere with the "use and enjoyment" of his property under the FHAA. *See Giebeler*, 343 F.3d at 1155; *Mobile Home I*, 29 F.3d at 1417–18.

In *Mobile Home I*, we considered "whether the duty imposed under the FHAA to make 'reasonable accommodations in rules' on behalf of handicapped persons may require a landlord to waive, in a given instance, fees generally applicable to all residents." 29 F.3d at 1414. The property management company in *Mobile Home I* had imposed a fee of $1.50 per day or $25 per month for guest parking on all residents of a mobile home lot. *Id.* at 1415. We held that the refusal to waive this generally applicable fee for a disabled resident who required a home health care aide stated a claim for relief under § 3604(f)(3)(B). *Id.* at 1418. Reversing the district court's dismissal of the plaintiff's claim, we found the management company's "effort to distinguish accommodations that have a financial cost from other accommodations unconvincing" and concluded that the FHAA is "concerned with facially neutral rules of all types." *Id.* at 1416–17; *see also Samuelson v. Mid–Atlantic Realty Co., Inc.*, 947 F.Supp. 756, 761 (D.Del.1996) ("It is clear that generally applicable fees—as in [*Mobile Home I*] and here—can interfere with the use and enjoyment of housing by the handicapped."). We remanded the case to the district court to consider whether the challenged fee rule had the required effect of denying the plaintiff an "equal opportunity

to use and enjoy her dwelling." *Mobile Home I*, 29 F.3d at 1418.

In *Giebeler*, we once again recognized that the "[i]mposition of burdensome policies, including financial policies, can interfere with disabled persons' right to use and enjoyment of their dwellings, thus necessitating accommodation." 343 F.3d at 1155. In *Giebeler*, the plaintiff's disability prevented him from working, which drastically reduced his income and caused him to fail to meet the minimum financial qualifications of the apartment complex where he sought an apartment. *Id.* at 1145, 1147. When his mother, who did meet these financial qualifications, offered to co-sign for the apartment, the complex owners refused, citing a management company policy against co-signers. *Id.* at 1145. We held that, under the FHAA, apartment owners cannot inflexibly apply a rental policy forbidding co-signers, where a policy adjustment was necessary to afford a disabled tenant equal opportunity to "use and enjoy" a dwelling. *Id.* at 1145, 1156. We explicitly joined other circuits in "recogniz[ing] that exceptions to neutral policies may be mandated by the FHAA where disabled persons' disability-linked needs for alterations to the policies are essentially financial in nature." *Id.* at 1152 n. 6 (citing *Smith & Lee Assocs. v. City of Taylor*, 102 F.3d 781, 795–96 (6th Cir.1996) and *Elderhaven, Inc. v. City of Lubbock*, 98 F.3d 175, 179 (5th Cir.1996)).

Under *Mobile Home I* and *Giebeler*, McGary sufficiently alleged that the City interfered with the use and enjoyment of his home when it charged him for its nuisance abatement activities. Contrary to the district court's assumption that discrimination based on "use and enjoyment" of a dwelling under 42 U.S.C. § 3604(f)(3)(B) is limited to complete exclusion from a home, we held in *Mobile Home I* that generally applicable fees as

low as $1.50 per day or $25 per month can constitute cognizable discrimination. 29 F.3d at 1415. The fact that the City cleaned McGary's property and then placed a lien on it to compensate for this service, rather than charge him a daily or monthly fee up front as in *Mobile Home I*, is inapposite. The lien the City put on McGary's house prevents the full use and enjoyment of his property because it interferes with his use of the property as collateral to borrow money. A sick man whose earning ability is impaired by disability might well need the borrowing power that his real estate gives him, as well as his right of occupancy. In both instances, the plaintiffs plausibly claimed that the use and enjoyment of their homes were impaired by financial burdens that the defendants refused to mitigate though accommodation, rendering dismissal under Rule 12(b)(6) inappropriate. *See Mobile Home I*, 29 F.3d at 1418 (recognizing that, while "[s]ome generally applicable fees might be too small to have any exclusionary effect.... The reasonable accommodation inquiry is highly fact-specific, requiring case-by-case determination," not appropriate for dismissal "solely on the pleadings").

Similarly, the fact that both *Mobile Home I* and *Giebeler* involved private landlord-tenant relationships, rather than a city-wide code enforcement program, does nothing to diminish McGary's claim. It is well-settled that 42 U.S.C. § 3604(f)(3)(B) imposes an "affirmative duty" on public agencies to reasonably accommodate disabled individuals by modifying administrative rules and policies. *See City of Edmonds*, 18 F.3d at 806. In *Edmonds*, we specifically held that the FHAA's reasonable accommodation requirement applies to municipal zoning ordinances. *Id.* at 806, 115 S.Ct. 1776. In doing so, we observed that "Congress intended the FHAA to apply to 'local land use and health and safety laws, regula-

tions, practices or decisions which discriminate against individuals with handicaps.' ... includ[ing] the 'enforcement of otherwise neutral rules and regulations on health, safety and land-use in a manner which discriminates against people with disabilities.' " *Id.* at 805, 115 S.Ct. 1776 (quoting 1988 U.S.C.C.A.N. at 2184–85).

Given the broad remedial scope of the FHA and the liberal pleading requirements for housing discrimination claims, McGary has stated a claim upon which relief can be granted for purposes of a Rule 12(b)(6) motion. McGary has alleged that he was unable to comply with the nuisance ordinance, and sought an extension of time, because of his illness. While we reverse the district court's dismissal of McGary's claim under Rule 12(b)(6), we do not reach the merits of his claim. Rather, we merely conclude that McGary should be given an opportunity to establish, based on a fully developed record, that the City failed to reasonably accommodate him in violation of the FHAA. *See Scheuer v. Rhodes*, 416 U.S. 232, 250, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) ("We intimate no evaluation whatever as to the merits of the petitioners' claims or as to whether it will be possible to support them by proof. We hold only that, on the allegations of their respective complaints, they were entitled to have them judicially resolved."); *see also Gilligan*, 108 F.3d at 250 (discussing the "danger[s] of dismissing a discrimination case on a minimal record").

#### 2. ADA Claim

██ McGary also alleges that the City discriminated against him in violation of Title II of the ADA by failing to reasonably accommodate his disability when it refused to grant him additional time to comply with the nuisance abatement ordinance. Title II provides that: "no qualified individual with a disability shall, by

reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Therefore, in order to state a claim of disability discrimination under Title II, McGary must allege four elements: (1) he "is an individual with a disability;" (2) he "is otherwise qualified to participate in or receive the benefit of some public entity's services, programs, or activities;" (3) he "was either excluded from participation in or denied the benefits of the public entity's services, programs, or activities, or was otherwise discriminated against by the public entity;" and (4) "such exclusion, denial of benefits, or discrimination was by reason of [his] disability." *Thompson v. Davis*, 295 F.3d 890, 895 (9th Cir.2002) (per curiam), *cert. denied*, 538 U.S. 921, 123 S.Ct. 1570, 155 L.Ed.2d 311 (2003).

The district court dismissed McGary's ADA claim solely on the ground that McGary failed to allege facts indicating that the City acted "by reason of" his disability, since non-disabled residents were also subject to the nuisance abatement ordinance. The court erred in doing so. We have repeatedly recognized that facially neutral policies may violate the ADA when such policies unduly burden disabled persons, even when such policies are consistently enforced. *See, e.g., Martin v. PGA Tour, Inc.*, 204 F.3d 994, 999–1000 (9th Cir.2000) (holding that a golf association rule banning use of golf carts in certain tournaments violated the ADA when it failed to modify this rule for a disabled golfer with a mobility impairment), *aff'd*, 532 U.S. 661, 121 S.Ct. 1879, 149 L.Ed.2d 904 (2001).

In *Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir.1996), we considered whether the State of Hawaii discriminated against a class of visually impaired plaintiffs by refusing to make modifications to a facially neutral policy requiring all animals entering the state, including guide dogs, to be quarantined for 120 days. We held that the State discriminated against plaintiffs because this facially neutral and universally enforced policy "burden[ed] visually-impaired persons in a manner different and greater than it burden[ed] others." *Id.* at 1484; *see also Rodde v. Bonta*, 357 F.3d 988, 998 (9th Cir.2004) ("[I]n *Crowder*, we confirmed that ... state action that disproportionately burdens the disabled because of their unique needs remains actionable under the ADA."). Like the plaintiffs in *Crowder*, McGary alleges that the City's nuisance abatement policy burdened him in a manner different from and greater than it burdened non-disabled residents, solely as a result of his disabling condition. McGary was physically impaired from meningitis and hospitalized. He claims that the City's denial of a reasonable time accommodation prevented him from complying with the ordinance due to this disability.

Therefore, he has sufficiently claimed that he was discriminated against "by reason of" his disability for the purposes of overcoming a Rule 12(b)(6) motion to dismiss.

In support of its dismissal, the district court suggested that in order for McGary to allege that he was discriminated against because of his disability, he must demonstrate "that a non-disabled neighbor with a yard in similar condition to plaintiff's was given an extension of time." In doing so, the district court appears to have misconstrued McGary's claim as either a "disparate treatment" or a "disparate impact" claim, rather than a "reasonable accommodation" claim. McGary brought his action under the federal regulations implementing Title II of the ADA, which require

public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); *see also Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir.2003).[3] A plaintiff need not allege either disparate treatment or disparate impact in order to state a reasonable accommodation claim. *See, e.g., Henrietta D. v. Bloomberg*, 331 F.3d 261, 276–77 (2d Cir.2003) ("[A] claim of discrimination based on a failure reasonably to accommodate is distinct from a claim of discrimination based on disparate impact."), *cert. denied,* — U.S. —, 124 S.Ct. 1658, 158 L.Ed.2d 356 (2004); *Bailey v. Georgia–Pacific Corp.*, 306 F.3d 1162, 1166 (1st Cir.2002) ("In addition to forbidding disparate treatment of those with disabilities, the ADA makes it unlawful for an employer to fail to provide reasonable accommodations for the known physical or mental limitations of otherwise qualified individuals with disabilities, unless the accommodations would impose an undue hardship on the operation of the business."); *Dunlap v. Ass'n of Bay Area Gov'ts*, 996 F.Supp. 962, 965 (N.D.Cal. 1998) ("[T]he ADA not only protects against disparate treatment, it also creates an affirmative duty in some circumstances to provide special, preferred treatment, or 'reasonable accommodation.' ").

The Supreme Court has also foreclosed the district court's "comparative" approach to determining whether an individual was discriminated against because of his disability. In *Olmstead v. Zimring*, 527 U.S. 581, 119 S.Ct. 2176, 144 L.Ed.2d 540 (1999), the Court held that undue institutionalization of persons with mental disabilities qualifies as discrimination "by reason of disability" under the ADA. *Id.* at 598, 119 S.Ct. 2176. The Court rejected the suggestion that a discrimination claim under the ADA must include a "comparison class" that was treated differently:

> Nor were [the plaintiffs] subjected to "discrimination," the State contends, because " 'discrimination' necessarily requires uneven treatment of similarly situated individuals," and [plaintiffs] had identified no comparison class, *i.e.*, no similarly situated individuals given preferential treatment. We are satisfied that Congress had a more comprehensive view of the concept of discrimination advanced in the ADA.

*Id.* (citation omitted); *see also Bultemeyer v. Fort Wayne Cmty. Sch.*, 100 F.3d 1281, 1283 (7th Cir.1996) ("[T]his is not a disparate treatment claim, but a reasonable accommodation claim, and it must be analyzed differently.[Plaintiff] is not complaining that [defendant] treated him differently and less favorably than other, non-disabled employees. He is not comparing his treatment to that of any other ... employee. His complaint relates solely to [defendant's] failure to reasonably accommodate his disability.").

The district court's suggestion that McGary must allege that the City inconsistently enforced its nuisance abatement policy misses the point of a reasonable accommodation claim. Indeed, the crux of a reasonable accommodation claim is a facially neutral requirement that is consistently enforced. In *Crowder*, we specifically held that, "[a]lthough Hawaii's

---

**3.** Although Title II of the ADA uses the term "reasonable modification," rather than "reasonable accommodation," these terms create identical standards. *See Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 816 n. 26 (9th Cir.1999). In this opinion, we "continue the practice of using these terms interchangeably." *Id.*

quarantine requirement *applies equally to all persons entering the state with a dog,* its enforcement burdens visually-impaired persons in a manner different and greater than it burdens others," and, therefore, necessitates accommodation. 81 F.3d at 1484 (emphasis added); *cf. Bay Area Addiction Research and Treatment, Inc. v. City of Antioch,* 179 F.3d 725, 733–35 (9th Cir.1999) (BAART) (clarifying that the "reasonable modifications" test under 28 C.F.R. § 35.130(b)(7) applies to facially neutral, but not facially discriminatory, laws). The purpose of the ADA's reasonable accommodation requirement is to guard against the facade of "equal treatment" when particular accommodations are necessary to level the playing field. *See Fortyune v. Am. Multi–Cinema, Inc.,* 364 F.3d 1075, 1086 (9th Cir.2004) ("[T]he ADA defines discrimination as a public accommodation treating a disabled patron the same as other patrons despite the former's need for a reasonable modification."); *Riel v. Elec. Data Sys. Corp.,* 99 F.3d 678, 681 (5th Cir.1996) ("The ADA mandate that employers must accommodate sets it apart from most other anti-discrimination legislation. Race discrimination statutes mandate equality of treatment, in most cases prohibiting consideration of race in any employment decision. In contrast, an employer who treats a disabled employee the same as a non-disabled employee may violate the ADA. By requiring reasonable accommodation, the ADA shifts away from similar treatment to different treatment of the disabled by accommodating their disabilities."); *Presta v. Peninsula Corridor Joint Powers Bd.,* 16 F.Supp.2d 1134, 1136 (N.D.Cal. 1998) ("[Title II of the ADA] guards against both intentional discrimination and simple exclusion from services resulting not from intentional discriminatory acts, but rather from inaction, thoughtlessness, or equal treatment when partic-ular accommodations are necessary.... In the context of disability, therefore, equal treatment may not beget equality, and facially neutral policies may be, in fact, discriminatory if their effect is to keep persons with disabilities from enjoying the benefits of services that, by law, must be available to them."). The district court's suggestion that *un* equal treatment is required to state a reasonable accommodation claim eviscerates this fundamental purpose of the ADA.

Apparently recognizing the weakness of the district court's reasoning, the City argues on appeal that McGary was not discriminated against "by reason of" his "disability," but rather because of his "financial inability" to pay someone to clean his yard for him. Citing our opinion in *Weinreich v. Los Angeles County Metropolitan Transportation Authority,* 114 F.3d 976 (9th Cir.), *cert. denied,* 522 U.S. 971, 118 S.Ct. 423, 139 L.Ed.2d 324 (1997), the City contends that it is not required to make modifications to its nuisance abatement procedures to accommodate McGary's financial situation. In *Weinreich,* we held that Los Angeles's transit system did not discriminate on the basis of disability by requiring updated certification of a rider's disability before he qualified for its Reduced Fare Program. *Id.* at 979. Weinreich sought an exemption from the recertification requirement "on the ground that he [was] indigent and [could not] afford to pay a private doctor to recertify his disability." *Id.* at 978. We held that the transit system's denial of Weinreich's requested exemption was not due to his medical disability, but rather due to his financial circumstances, and was therefore not proscribed by Title II. *Id.* at 979.

*Weinreich* does not apply to the facts of this case. Unlike Weinreich, McGary does not allege that he was unable to afford to

hire someone else to clean his yard. Rather, McGary sought more time to comply with the nuisance abatement program as a result of his disabling condition, which necessitated his hospitalization for at least a part of the City's allotted compliance period.[4] We hold that McGary adequately alleged that the City discriminated against him "by reason of" his disability.[5]

The City argues, in the alternative, that we should affirm the district court's decision because McGary failed to allege that he was "excluded from participation in" or "denied the benefits of" the nuisance abatement program under Title II. The City insists that McGary was actually "included" in—rather than "excluded from"—its nuisance abatement program, and it contends that the ADA does not require reasonable modification of nuisance abatement activities, since the enforcement of a municipal ordinance is not a cognizable "benefit" under the ADA.

In making these arguments, the City mistakenly assumes that since McGary's compliance with the nuisance abatement ordinance was compelled, rather than voluntary, the City was under no obligation to accommodate his disability. In *Pennsylvania Department of Corrections v. Yeskey*, 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998), the Supreme Court rejected the petitioners' contention that the phrase "benefits of the services, programs, or activities of a public entity" under Title II of the ADA does not include state prisons because "state prisons do not

provide prisoners with 'benefits' of 'programs, services, or activities' as those terms are ordinarily understood." *Id.* at 210, 118 S.Ct. 1952. The Court held that prison-based programs, services, and activities fall within the purview of the ADA's reasonable modifications requirement, even though "participation" in such programs, services, and activities may be "mandatory." *Id.* at 211, 118 S.Ct. 1952; *see also Lee v. City of Los Angeles*, 250 F.3d 668, 691 (9th Cir.2001) (recognizing that "incarceration itself is hardly a 'program' or 'activity' " under the ADA, but that "mental health services and other activities or services undertaken by law enforcement and ... correctional facilities" come within the meaning of the ADA); *Gorman v. Bartch*, 152 F.3d 907, 912 (8th Cir.1998) (holding that transportation of an arrestee to the police station is a "service" under the ADA). We have extended the Supreme Court's holding in *Yeskey* to other mandatory activities, such as parole hearings, *see Thompson*, 295 F.3d at 897–99, and pre-trial detentions, *see Lee*, 290 F.3d at 691.

We see no reason to distinguish between municipal code enforcement and the other mandatory activities we have found to fall within the purview of the ADA. It is axiomatic that "the ADA must be construed broadly in order to effectively implement the ADA's fundamental purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." *See Barden v. City of Sacramento*, 292

---

4. In fact, volunteers from the CAP program did attempt to assist McGary in removing the debris from his yard, but were unable to clean the yard to the City's satisfaction before the warrant issued. There is nothing in the record to suggest that, given more financial resources, McGary could have hired a private contractor who would have been able to fully clean the property in time.

5. We also observe that under the City's sweeping "financial hardship" argument, it would be virtually impossible to ever state a reasonable accommodation claim under the ADA, since it is difficult to imagine *any* situation in which paying someone else to "do the job" would not alleviate burdens placed on people with disabilities. We decline to read into the ADA such a self-defeating limitation.

F.3d 1073, 1077 (9th Cir.2002) (quotation marks and alteration omitted), *cert. denied*, 539 U.S. 958, 123 S.Ct. 2639, 156 L.Ed.2d 656 (2003). Our case law interpreting the ADA strongly counsels against carving out " 'spheres in which public entities may discriminate on the basis of an individual's disability.' " *Thompson*, 295 F.3d at 899 (quoting *BAART*, 179 F.3d at 731). In fact, we have already recognized that local land use laws, such as zoning, fall squarely within the type of public activities covered by Title II of the ADA. *See BAART*, 179 F.3d at 730–732; *see also Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 44 (2d Cir.1997) (holding that the ADA encompasses zoning decisions because zoning is "a normal function of a governmental entity"), *overruled on other grounds by Zervos v. Verizon New York, Inc.*, 252 F.3d 163, 171 n. 7 (2d Cir.2001).

The regulations interpreting the ADA support our conclusion that compliance with municipal code enforcement can constitute a benefit of the services, programs, or activities of a public entity under Title II.[6] The regulations specify that the statutory term "benefit" under the ADA includes the "provision of services, financial aid or disposition (i.e., treatment, handling, decision, sentencing, confinement, or other prescription of conduct)." 28 C.F.R. § 42.540(j).[7] The Department of Justice's Technical Assistance Manual, which interprets its regulations, uses municipal zoning as an example of a public entity's obligation to modify its policies, practices, and procedures to avoid discrimination. The Americans with Disabilities Act: Title II Technical Assistance Manual § II–3.6100, illus. 1 (1993) (TA Manual).[8] Moreover, the Department of Justice's commentary on the ADA establishes that "[t]he general regulatory obligation to modify policies, practices, or procedures requires law enforcement to make changes in policies that result in discriminatory arrests or abuse of individuals with disabilities." 28 C.F.R. Pt. 35, App. A, Subpart B.

We hold that McGary adequately stated a claim under Title II of the ADA when he alleged that the City failed to reasonably accommodate his disability by denying him additional time to participate in the nuisance abatement program without incurring charges. The "benefit" McGary sought in this case was to be allowed sufficient time to comply with the City's code

---

6. Department of Justice regulations interpreting Title II should be given controlling weight unless they are "arbitrary, capricious, or manifestly contrary to the statute." *BAART*, 179 F.3d at 732, n. 11 (quoting *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)). There is nothing to suggest—nor do the parties argue—that the regulations here are arbitrary, capricious, or manifestly contrary to the statute.

7. Although this regulation was originally promulgated under Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C.A. § 794, Title II of the ADA must be interpreted in a manner consistent with Section 504. *See* 42 U.S.C. §§ 12133, 12134(b) & 12201(a); *see also Vinson v. Thomas*, 288 F.3d 1145, 1152 n. 7 (9th Cir.2002) ("We examine cases construing claims under the ADA, as well as section 504 of the Rehabilitation Act, because there is no significant difference in the analysis of rights and obligations created by the two Acts"), *cert. denied*, 537 U.S. 1104, 123 S.Ct. 962, 154 L.Ed.2d 772 (2003); *Gorman*, 152 F.3d at 913 (applying 28 C.F.R. § 42.540 to hold that the ADA's reasonable accommodation requirement applies to the transportation of arrestees).

8. We afford the TA Manual substantial deference unless another reading is compelled by the regulation's plain language. *See BAART*, 179 F.3d at 732, n. 11. We agree with the Second Circuit that there is nothing to suggest that this section of the TA Manual is inconsistent with the regulations. *See Innovative Health Sys.*, 117 F.3d at 45 n. 8.

enforcement activities in a manner consistent with his disability. *Cf. Gorman,* 152 F.3d at 913 ("The 'benefit' Gorman sought in this case was to be handled and transported in a safe and appropriate manner consistent with his disability.").

While we reverse the district court's dismissal of McGary's ADA claim under Rule 12(b)(6), we do not reach the underlying merits of his claim. The district court made no findings with regard to the reasonableness of McGary's proposed modification to the City's nuisance abatement program, which remains a disputed factual issue. *See Crowder,* 81 F.3d at 1485 (remanding where there remains a "genuine dispute of material fact as to whether the plaintiffs' proposed modifications ... amount to 'reasonable modifications' which should be implemented, or 'fundamental alterations,' which the state may reject") (alterations omitted).

In reversing the district court's dismissal we also recognize that McGary's claim raises some novel issues within this circuit with regard to the extent of a public agency's obligation to accommodate an individual's disabilities in its enforcement of municipal codes. However, the fact that McGary's claim does not fall within the four corners of our prior case law does not justify dismissal under Rule 12(b)(6). On the contrary, Rule 12(b)(6) dismissals "are especially disfavored in cases where the complaint sets forth a novel legal theory that can best be assessed after factual development." *Baker v. Cuomo,* 58 F.3d 814, 818–19 (2d Cir.), *cert. denied sub nom., Pataki v. Baker,* 516 U.S. 980, 116 S.Ct. 488, 133 L.Ed.2d 415 (1995), *vacated in part on other grounds,* 85 F.3d 919 (2d Cir.1996) (en banc). As we have previously observed, " '[t]he court should be especially reluctant to dismiss on the basis of the pleadings when the asserted theory of liability is novel or extreme, since it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions.' " *Elec. Constr. & Maint. Co., Inc. v. Maeda Pac. Corp.,* 764 F.2d 619, 623 (9th Cir.1985) (quoting 5 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* § 1357, at 601–03 (1969)). In addition, as in our holdings in the FHAA context, we have also recognized that the question of what constitutes a reasonable accommodation under the ADA "requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards." *Wong v. Regents of Univ. of Cal.,* 192 F.3d 807, 818 (9th Cir.1999). The merits of McGary's novel legal arguments can only be assessed after the parties have had an opportunity to develop the facts in this case. We should note, however, that the accommodation required by the law is limited, not just expanded, by the word "reasonable." The purpose of a municipal law such as the one at issue in this case is the protection of the community. An accumulation of debris might threaten neighbors with hazards to trespassing children, disease from rodents that nest in the debris, toxic runoff from the debris, or other hazards. The municipality remains free at trial to show that the imminence of danger, and the extent of time McGary had prior to notice, would make further accommodation for his severe illness unreasonable.

*3. Claims Arising Under State and Local Law*

McGary also alleges that the City violated Oregon Revised Statutes § 659A.145, prohibiting discrimination on the basis of disability in the provision of housing, and Portland City Code 3.1000.005, prohibiting discrimination on the basis of disability in the provision of services. The district court assumed that these state and local

laws should be interpreted in the same manner as their federal counterparts, and dismissed these claims based on its reasoning under the FHAA and ADA claims. Because the district court's reasoning with regard to both the FHAA and ADA claims was flawed for the reasons discussed above, we also reverse its dismissal of McGary's state and local claims.

## CONCLUSION

Because McGary has alleged sufficient facts to support his causes of action under the FHAA, the ADA, and parallel state and local law, we reverse the district court's dismissal of these claims and remand for further proceedings consistent with this opinion.